**GIBBS SHIPYARDS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GIBBS CORPORATION, Respondent.**

**Nos. 20790, 20909.**

United States Court of Appeals Fifth Circuit.

June 22, 1964.

Daniel R. Coffman, Jr., Charles W. Merritt, Referee in Bankruptcy, Jacksonville, Fla., Hamilton & Bowden, Jacksonville, Fla., for petitioner Gibbs.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, William Wachter, Atty., Washington, D. C., Arnold Ordman, Gen. Counsel, Melvin J. Welles, Attorney, for National Labor Relations Board.

Before TUTTLE, Chief Judge, BROWN, Circuit Judge, and BREWSTER, District Judge.

TUTTLE, Chief Judge:

Gibbs Shipyards, Inc., (hereafter G.S.I.) petitions for review of an N.L.R.B. order holding it responsible for discriminations allegedly occurring under Gibbs Corporation (hereafter Gibbs). In the other proceeding the National Labor

Relations Board petitions for enforcement.

The two questions here are (1) whether G.S.I. should be held responsible for acts committed by Gibbs either on the theory that G.S.I. effectively controlled Gibbs at the time of the alleged occurrences or on the theory that G.S.I. is bound as Gibbs's successor, and (2) whether the broad scope of the order entered against G.S.I. by the Board is appropriate in light of the fact that G.S.I. is a newly organized corporation that the order in effect considers colored to some extent by the prior labor record of Gibbs.

The facts essential to an understanding of the case are as follows:

Gibbs had been in the business of building and repairing ships at Jacksonville, when on December 19, 1961, it entered into a contract with America Corporation for the sale of substantially all of its machinery and real property. America then, a week later, formed G.S.I., a wholly owned subsidiary. Meanwhile, Gibbs was in financial difficulty and in January 1962 it filed a Chap. XI petition; the court permitted it to continue operations as a debtor in possession. A new five man executive committee for Gibbs was formed by nominees of G.S.I.; the members included the president and the secretary of G.S.I., a vice president of Gibbs, a member of Gibbs's former executive committee, and an outsider brought in by America to be president and general manager of the shipyard. The first two representatives of America and G.S.I. took no active part in the management of the yard. The sale agreement gave the executive committee full power to control the operation of the company and forbade the board of directors to interfere in any manner. The sale of assets to G.S.I. was authorized by the Referee in Bankruptcy on March 2, 1962, the sale was ratified by Gibbs's board of directors on March 23, and the Referee's order confirming the sale became final on April 6. Then in May 1962 the owners of Gibbs petitioned the trustee to determine whether the sale to G.S.I. should be rescinded. After the sale the business operations continued substantially unchanged, as did the labor and management force, with the exception of Gibbs's Industrial Relations Director who was replaced by a new personnel director. G.S.I. recognized the collective bargaining agreement between Gibbs and the independent yard union. On these facts the Board found that G.S.I. was directly responsible for the labor practices of Gibbs during the period from the formation of the executive committee on February 14 until the sale was consummated April 6, 1962, since G.S.I. was effectively in control of the shipyard or, alternatively, on the ground that G.S.I. was bound as Gibbs's successor to remedy the unfair practices of its successor.

On February 27, 1962, employees Harvey and Stebbins passed out authorization cards on behalf of the sheet metal workers. There is testimony that four times during the day foreman Strickland said in regard to this activity which he observed, that "this is bad business"; he denied saying this. The next day the two employees were laid off; there had been a steady and substantial reduction in the working force as a result of Gibbs's financial distress. The reason given for the lay-offs was seniority, and the employer urges that others who were known to have signed cards were not laid off. Two employees with less seniority were not laid off, it is explained, because they were working on a complex aluminum console which had to be completed by the persons starting it. There is also somewhat inconsistent testimony that Strickland told Harvey either that he was laid off because he was not a member of the independent union or that he could go back to work if he had seniority in the union. A week later the employees returned to pick up some tools; one testified that he was informed foreman Strickland's pay had been cut and that Strickland said, "Well, you see what has happened."

The first hearing in this case ended on June 15, 1962. A month later Harvey and Stebbins applied for reemployment at the shipyard. They testified they were

told that no sheet metal workers were being hired that day. They later were told that a sheet metal worker had been hired that day, and upon returning to the shipyard employment office they saw two others who, they say, were hired. After the three were hired, Stebbins returned to the employment window and was again told no sheet metal workers were being hired. It is admitted that other sheet metal workers were hired after Harvey and Stebbins were laid off, but G.S.I. argues that this merely shows absence of anti-union discrimination since some of the men employed were members of the sheet metal union. This testimony was brought out at a second hearing, necessitated by the death of the first trial examiner before his report was filed.

The Perrin brothers were employed at the yard as third class pipefitters; on February 28, 1962 both distributed some union authorization cards. One brother was informed by his foreman that the yard superintendent had inquired about Perrin's union activity. Both brothers were laid off the next day; the second brother testified that he was told by their foreman and the personnel director that he had been laid off at the direction of the yard superintendent for union activity. Witnesses for G.S.I. said that the Perrins were not good workers, that there was no knowledge of their union activities, and that no one said they were being fired because of union activities. There was conflict in the testimony of two G.S.I. witnesses touching on the event of the firing.

The Board found that the lay-offs were on account of union activities and hence in violation of Section 8(a) 3 and 1. The statement about Harvey's status in the independent union was found to constitute employer support of the independent in contravention of 8(a) 2 and 1. The refusal to rehire Harvey and Stebbins was held unlawful under 8(a) 4, 3 and 1 since due to their prior union activities and their testimony at the earlier hearing. The Board ordered G.S.I. to reinstate the discriminatees not rehired and reimburse all four for lost pay. Gibbs was held jointly liable for pay lost prior to the day the sale became final. Finally, the Board ordered G.S.I. to cease and desist all unfair labor practices found *plus any other manner of interfering with employee rights under the act.*

■ In spite of the employer's evidence and the difficulty expressed by the trial examiner in making credibility determinations between conflicting evidence, the findings that the lay-offs were discriminatorily motivated may be upheld. Not only do the statements attributed to the foreman and the yard superintendent point to an unlawful motive, the surrounding circumstances corroborate the findings. In the case of Harvey and Stebbins the retention of others with less seniority and the continued hiring of other sheet metal workers belie the employer's contention that the lay-offs were nondiscriminatory and based solely upon economic considerations. The evidence on the Perrin brothers' lay-off is not as strong; there is considerable testimony that they were poor workers. However, the fact that they were both laid off the day following their distribution of union authorization cards appears something more than a mere coincidence. The employer's argument that these lay-offs were not discriminatory because other sheet metal workers union members were not laid off carries little weight; the ones laid off had been actively engaged in distribution of cards. Their lay-offs could serve as an example to the others. In addition, the fact that other sheet metal union members were subsequently hired proves not so much a lack of intent to discriminate against that union as the lack of a valid excuse for discharging Stebbins and Harvey.

On the other hand, the evidence of an 8(a) 2 violation was totally insufficient. The basis of the charge was the alleged statement of Strickland which he denies and which the two employees then present reported differently. Taking it in its strongest form, it was a statement that Harvey was fired because of his lack of status in the independent union, a ground which Harvey immediately chal-

lenged as insufficient and which the foreman apparently never urged. This is different from N.L.R.B. v. Buitoni Foods Corp., 298 F.2d 169 (3 Cir. 1962), where the employer ordered the organization of a grievance committee to bargain with it, called an election, and actually conducted the election.

There is no substantial evidence on the record as a whole to support the finding that the failure to rehire Stebbins and Harvey was partially the result of their prior testimony before the NLRB and hence a violation of 8(a) 4. There was no evidence of an intent so to discriminate other than the Board's assertion of a "general knowledge" of all employees that Stebbins and Harvey had so testified. There is no rule that any discrimination against one who has testified adversely to the employer is automatically an 8(a) 4 violation. Without evidence bringing knowledge of this fact home to management there is no support for a finding that it partially motivated the discharges.

■ The problem of the responsibility of G.S.I. for Gibbs's discriminatory activities is a close one. G.S.I. or its parent, America, (G.S.I. was at the time no more than a shell) did have control through its selection of Gibbs's executive committee. Although that committee as a body was answerable only to Gibbs, that corporation had by contract turned management effectively over to G.S.I. N.L.R.B. v. Hudson Pulp & Paper Co., 5 Cir., 273 F.2d 660, involved a manufacturing corporation and a separate corporation which furnished drivers and trucks for transporting the products. The drivers were on the payroll of the manufacturer, which also retained a veto power over the hiring and firing; this arrangement was held to make the transporter an agent of the manufacturer. It has not been shown that G.S.I. had this close a relationship to Gibbs. Cf. N.L.R.B. v. New Madrid Mfg. Co., 8 Cir., 215 F.2d 908, where the "control" theory was rejected. However, the practical control by G.S.I. before the sale was consummated is adequate to hold G.S.I. without reference to the "successor" theory under the principles laid out in N.L.R.B. v. Tempest Shirt Mfg. Co., 285 F.2d 1, 5 Cir.,—same business, same machinery, same products, etc. See also the New Madrid case, 215 F.2d at 913–915.

■ The broad order is unwarranted in this case. Although there was a sufficient continuity of interest to justify holding G.S.I. responsible to correct the particular injustices of Gibbs, there is no adequate ground for charging G.S.I. with the previous transgressions of Gibbs.

As modified by this opinion, the Board's order will be enforced.