**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**COCA COLA BOTTLING COMPANY OF BUFFALO, INC., Respondent.**

**No. 63, Docket 86–4065.**

United States Court of Appeals, Second Circuit.

Argued Aug. 29, 1986.
Decided Jan. 28, 1987.

Marc B. Seidman, N.L.R.B., Washington, D.C. (W. Christian Schumann, Atty., Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for petitioner.

James A. Prozzi, Pittsburgh, Pa. (Lubow & Prozzi, P.C., Pittsburgh, Pa., of counsel), for respondent.

Before CARDAMONE, PIERCE and ALTIMARI, Circuit Judges.

PIERCE, Circuit Judge:

The National Labor Relations Board (the "Board" or "NLRB") petitions for enforcement of an order. The order substantially adopts the decision and order recommended by an administrative law judge ("ALJ") which requires respondent Coca Cola Bottling Company of Buffalo, Inc. (the "Company") to reinstate one Richard Smith, a former employee, with back pay.[1] The ALJ based this order on a finding that the Company discharged Smith because Smith, who had been subpoenaed to testify on

---

1. The order requires the Company (1) to cease and desist from discharging employees for engaging in activities protected under section 7 of the National Labor Relations Act ("NLRA" or the "Act"), 29 U.S.C. § 157 (1982), and from restraining or coercing employees in the exercise of their section 7 rights; (2) to offer former employee Richard Smith reinstatement to his former job or to an equivalent job without loss of seniority or any other benefits and to compensate Smith for losses incurred due to the unlawful discharge; (3) to remove all references to the discharge of Smith from its records; (4) to preserve and make available to the NLRB any records necessary to determine the amount of back pay to which Smith is entitled; (5) to post notice of the NLRB's order; and (6) to notify the NLRB of steps taken to comply with the order.

The order further provides for the reinstatement of Joseph Teresi, who also was discharged as a result of the circumstances surrounding the strike. See infra. However, the parties have settled this matter with respect to the Teresi discharge and we do not discuss the validity of that portion of the Board's order.

behalf of one Joseph Teresi in a state criminal case, had planned to testify that Teresi did not commit the crime charged. The ALJ further found that the Company intended to discourage Smith and other employees from offering testimony that would exonerate Teresi and thereby show that the Company erred when it accused Teresi of strike misconduct. The ALJ concluded that the Company's conduct violated sections 7 and 8(a)(1) of the Act, 29 U.S.C. §§ 157, 158(a)(1) (1982). The Board affirmed this conclusion without an opinion and adopted the ALJ's order.

We grant the Board's application for enforcement of the order.

## BACKGROUND

The Company, which is located in Tonawanda, New York, distributes soft drinks in the Buffalo area. For over 20 years, it did so through independent contractors. In September, 1981, the Company changed its practice and began using its own employees to deliver the products. The ALJ noted that "some, if not all" of the independent contractors became employees of the Company. In November, 1981, Local 264 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the "Union") petitioned the Board for an election. The petition was granted. The Union prevailed in the election, and the Board certified the Union as the bargaining agent for the Company's drivers in January, 1982.

### The Strike and Teresi's Discharge

In October or November, 1981, not long after the independent contractors became employees of the Company, Joseph A. Teresi, on behalf of the employees, encouraged the Union to organize the Company's drivers. When the Union started its organizational drive, Teresi actively supported the effort and became one of the Union's most active members.

On April 13, 1982, the Union called a strike. Based upon record evidence, the ALJ found that Teresi helped organize the strike and acted as a spokesman for the Union in television interviews.

During the afternoon of that day, the Tonawanda Police Department received a telephone call from an unidentified person who stated that a bomb was set to explode in the Company's plant at 4:00 p.m. No bomb was ever found. However, Teresi was arrested and charged with making the threat after several of the Company's managers identified Teresi's voice on a tape recording of the threat. Following the arrest, the Company discharged Teresi. In December, 1982, the district attorney dismissed the charges against Teresi stating "that this defendant is innocent of the charge." Apparently one reason for the dismissal of the charges was the confession by Teresi's cousin, Marranca, that he had made the bomb threat. Nevertheless, the Company did not reinstate Teresi. Although the ALJ did not find this decision to be motivated by anti-union animus, he recommended ordering the Company to reinstate Teresi because the Company discharged him under the mistaken belief that Teresi made the telephone threat which, if made, would have constituted strike misconduct. See NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1) (1982); see also NLRB v. Burnup & Sims, Inc., 379 U.S. 21, 23, 85 S.Ct. 171, 172, 13 L.Ed.2d 1 (1964). The Board accepted the ALJ's recommendation. Later, the parties settled the matter with respect to Teresi.[2]

### The Subpoena and Smith's Discharge

It was in this factual context that the Company discharged Richard Smith, a driver who is the subject of this opinion. The ALJ found that Smith was related to Teresi by marriage and, along with Teresi, had participated actively in the Union's strike activities. After the strike ended in May, Smith returned to work.

Soon thereafter, a significant chain of events occurred. On June 14, 1982, Smith neglected to pick up empty bottles at a customer's store. Smith's area supervisor, one Daniels, and a sales manager, one

2. See note 1, *supra.*

Koon, spoke to him several times regarding the incident. On June 21st, Daniels gave Smith a memorandum which stated that "[a]ny further breach of company policy will lead to disciplinary action up to and including discharge."

The following day, Smith informed one Pitman, the dispatcher at the Company, that Smith had been subpoenaed to testify at Teresi's criminal trial, which was scheduled for June 23rd. Evidently, on the day of the bomb threat, Smith was on the picket line at the time the telephone bomb threat was made and his testimony apparently would have tended to exonerate Teresi.

Smith worked through June 22nd without incident, and on the next day he remained at home waiting to be called to court pursuant to the subpoena. However, the trial was postponed and, as it developed, he never was required to testify since the district attorney eventually dropped the charges.

On June 24th, Smith returned to work. Soon after Smith arrived, Koon handed him a notice signed by Daniels. The notice outlined the circumstances surrounding the June 14th incident, described above, which constituted the subject of the June 21st warning memorandum. The notice concluded,

> this act of insubordination, in conjunction with your past record involving falsification of Company documents and your poor driving record, have [sic] forced us to terminate our association with you, effective immediately.

Smith testified before the ALJ that he spoke to the Company's general manager, one Robert Shaffer, on June 25th and asked to be reinstated, but Shaffer only responded that he was sorry about the situation. Smith further testified that when he told Shaffer that Teresi was innocent, "Mr. Shaffer replied that I was not to perjure myself. He told me that."

The ALJ pointed out that the only intervening event between Daniels' warning to Smith on June 21st for failing to pick up empties and Smith's discharge on June 24th was his being subpoenaed by Teresi to testify in the scheduled criminal trial.

The Company's business manager, Lawrence E. Finnigan, testified that he treated Daniels' warning as a recommendation, and that this was his usual practice. Finnigan stated that based on a review of Smith's personnel file, however, he decided to fire Smith because the file reflected "constant and continuous ignoring of company policies and procedures." Thus, he instructed Koon and Daniels to prepare and deliver the discharge notice. On cross-examination, Finnigan could recall only two other particular occasions when he modified a disciplinary notice.

At the hearing before the ALJ, Shaffer described the contents of Smith's personnel file, which was placed in evidence. It revealed that Smith received two pay increases from 1981 to 1982. In December, 1981, he received what the ALJ described as an "exceptionally high" employee appraisal from Daniels. The file also reflected that in January, 1982, he was suspended for three days for having discrepancies in his daily log; in September, 1981, he damaged a hand truck while making a delivery; in March, 1981, he hit a low pole with his truck after making a delivery; in December, 1980, he failed to make all of his scheduled deliveries one day; and in December, 1980, he backed his truck into a sign and failed to report the accident because he observed no damage.

After assessing the evidence, the ALJ concluded that the Company fired Smith in order to discourage Smith and other employees from testifying on behalf of Teresi and that this violated section 8(a)(1) of the Act.

## DISCUSSION

The Company presents three principal arguments against enforcement of the Board's order as it relates to Smith. First, it argues that the section 8(a)(1) claim was not contained in the amended complaint and was not fully litigated, thus rendering the order a violation of the Company's due

process rights. Next, the Company argues that Smith's firing was not related to his engaging in a protected concerted activity as defined by the Act. Finally, the Company argues that the General Counsel failed to carry the prima facie burden of proving that the Company's firing of Smith was motivated by his protected concerted activity.

### 1. *Full Litigation of the Claims*

■ As a general proposition, the NLRB may not find that an unfair practice exists without first affording the alleged violator notice and an opportunity for a hearing. This requirement is primarily a matter of due process. The notice requirement is only satisfied if the notice reasonably enables the charged party to prepare his case. *See generally* B. Schwartz, Administrative Law § 6.5, at 283–86 (2d ed. 1984) (citing *Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1074 (1st Cir.1981)). Thus, the complaint ordinarily must contain notice of the particular violations charged. *NLRB v. Blake Construction Co.*, 663 F.2d 272, 279–82 (D.C.Cir.1981); *Maintenance Service Corp.*, 275 N.L.R.B. No. 198, at 10 (Aug. 21, 1985).

■ Problems arise in those cases where the facts adduced at the hearing before the ALJ fit a violation other than as charged in the complaint. As the Company points out, the uncharged violation may only be found by the ALJ if all issues surrounding the violation have been litigated fully and fairly. *See NLRB v. Solboro Knitting Mills Inc.*, 572 F.2d 936, 944 (2d Cir.), *cert. denied*, 439 U.S. 864, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978). The Company notes that the amended complaint charged the Company with a section 8(a)(3) violation, but not with a section 8(a)(1) violation, and argues that the issues surrounding the section 8(a)(1) violation were not fully and fairly litigated.

The main thrust of the Company's argument is that since neither the amended complaint nor the General Counsel ever mentioned section 8(a)(1), the Company could not have been aware that a section 8(a)(1) violation was being pursued. As this argument goes, if the Company did not know of the charges against it, the matter was not fully litigated.

■ First, we note that the language in the amended complaint closely tracks the language of sections 7 and 8(a)(1), which outlaw interference with enumerated protected activities.[3] Thus, although the amended complaint did not allege a section 8(a)(1) violation as such, it did allege behavior constituting such a violation and it did so using precisely the pertinent terminology found in the statute.

Furthermore, our review of the record reveals that the key issues surrounding the section 8(a)(1) violation were fully litigated, namely, (1) whether Smith engaged in a protected concerted activity, and (2) whether the Company's firing of Smith was motivated by Smith's concerted activity.

As to the former, no one disputes that Smith was subpoenaed and was prepared to testify on behalf of Teresi. The Company contends that if it had known a section 8(a)(1) violation were being litigated it would have argued before the ALJ that testifying at a criminal trial does not constitute a protected concerted activity within

| 3. | LANGUAGE OF COMPLAINT | LANGUAGE OF STATUTE | LANGUAGE OF COMPLAINT | LANGUAGE OF STATUTE |
|---|---|---|---|---|
| | The Company terminated Smith because he *engaged in* activity on behalf of the Union and/or *concerted activities for the purpose of collective bargaining or mutual aid or protection.* | It shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section [7]. . . . NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1)(1982). | Amended Complaint at 3 (emphasis added) | Employees shall have the right . . . to *engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.* NLRA § 7, 29 U.S.C. § 157 (1982) (emphasis added). |

the meaning of the Act. However, this issue involves applying law to the facts as found by the ALJ. Since this issue has been briefed and argued before us and the Board, we cannot say that this "lost" opportunity to argue the issue before the ALJ prejudiced the Company.

■ With respect to the issue of the Company's motivation, we note that the ALJ's opinion focuses carefully on the Company's motivation for discharging Smith. The General Counsel presented ample proof of this motivation, which proof included, *inter alia*, (1) evidence that the only intervening event between the warning to Smith regarding his failure to pick up empty bottles and the firing was the subpoena, and (2) evidence that Shaffer, the general manager of the Company, remarked to Smith that he should not perjure himself. Although Shaffer's statement could be considered ambiguous, as the factfinder the ALJ was entitled to resolve any ambiguity in light of all of the circumstances of the case. The Company offered evidence to rebut any inference of improper motivation. As indicated, the Company's business manager, Finnigan, testified at length regarding the reasons behind Smith's firing and the Company offered Smith's personnel file as evidence that Smith was a problem employee. The ALJ did not credit this evidence, characterizing Finnigan's explanation of the firing as an "afterthought designed to conceal the real reason for Smith's discharge, i.e.—to discourage Smith and other employees from offering testimony which would exonerate Teresi and thereby demonstrate that [the Company] had erred in accusing Teresi of strike misconduct." ALJ's Decision at 13.

The case of *AMC Air Conditioning Co.*, 232 N.L.R.B. 283 (1977), is instructive. In *AMC*, the complaint alleged that a discharge violated section 8(a)(3), but did not charge a violation of section 8(a)(1). The Board found that the discharge clearly violated section 8(a)(1). *Id.* at 285. Just as here, the complaint alleged that the employee "was discharged for engaging in 'concerted activities for the purpose of ...

mutual aid or protection.' " *Id.* (quoting Complaint therein). As in this case, the Respondent's defense was directed at proving that the discharge was not motivated by the employee's participation in concerted activities, but instead was motivated by a proper purpose. Since the defense therein, as here, was directed toward the "section 8(a)(1) type allegations" in the complaint, the Board found that the section 8(a)(1) violation had been fully litigated. *Id.* at 285–86; *see also Solboro Knitting Mills*, 572 F.2d at 944.

In light of this, we conclude that the section 8(a)(1) violation was fully litigated, and the absence of specific mention of "section 8(a)(1)" as such in the amended complaint did not invalidate the Board's ruling.

### 2. *Protected Concerted Activity*

Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) (1982), makes it unlawful for an employer to violate rights protected by section 7 of the Act, 29 U.S.C. § 157 (1982). Section 7 provides in relevant part that employees "shall have the right ... to engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection." Herein, the ALJ found that the discharge of Smith infringed on this right by tending to discourage Smith and other employees from testifying on behalf of Teresi. The Company argues that testifying at a criminal trial pursuant to a subpoena does not constitute a "concerted" activity for "mutual aid or protection."

■ We note that the mutual aid or protection clause was intended broadly to protect activities beyond grievance settlement, collective bargaining and self-organization. *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565, 98 S.Ct. 2505, 2512, 57 L.Ed.2d 428 (1978). It also extends to protect employees' efforts to "improve their lot as employees through channels outside the immediate employee-employer relationship." *Id.* As a general proposition, the task of delineating the boundaries of the "mutual

aid or protection" clause rests with the Board since the Board has an expertise in the field that we as a reviewing court should not lightly disregard. *See id.* at 568, 98 S.Ct. at 2513. *See generally* B. Schwartz, *supra,* at 647–61 (discussing scope of review of administrative mixed findings of law and fact).

The Company argues that testifying under a subpoena lacks the element of self-will which the Board has suggested may be necessary in order to show that an employee has engaged in concerted activity within the meaning of section 7 of the Act. In *Autumn Manor, Inc.,* 268 N.L.R.B. 239, 242 n. 8 (1983), the Board suggested that testifying under subpoena could indicate a lack of voluntariness, which may be an element of a section 8(a)(1) violation.

■ We have no doubt that a subpoena to testify at a trial imposes an element of coercion upon the person called to testify. However, we do not necessarily conclude that the testimony Smith was to give was coerced. Moreover, one cannot inevitably conclude that an act performed by a person under legal compulsion was not done willingly. To do so would be to presume that the person's only motivation to testify was the legal compulsion. The Company points to no evidence indicating that Smith was an unwilling witness. To the contrary, the record seems to indicate that Smith was quite willing to testify. As an active union member it is unlikely that Smith would have resisted testifying on behalf of Teresi, a fellow union activist. Also, after his own firing, Smith volunteered to the Company's general manager that Teresi was innocent. Consequently, we are confident that Smith's activity pursuant to the subpoena falls sufficiently within the meaning of voluntary to make it "concerted" for the purpose of sections 7 and 8(a)(1).

The Company also argues that testifying at a criminal trial lacks the necessary "reasonable connection to matters affecting the interests of employees *qua* employees" and is therefore not protected under sections 7 and 8(a)(1). *See G & W Electric Specialty Co.,* 154 N.L.R.B. 1136, 1137 (1965), *enforced in part, set aside in part,* 360 F.2d 873 (7th Cir.1966). The Company draws this conclusion from Board decisions stating that the Board ordinarily is not bound by the results of criminal proceedings. *See, e.g., Gold Kist, Inc.,* 245 N.L.R.B. 1095, 1103–05 (1979) (dismissal of criminal charges); *W.C. McQuaide, Inc.,* 220 N.L.R.B. 593, 594 (1975) (criminal conviction) (citing *NLRB v. Cambria Clay Products Co.,* 215 F.2d 48, 54 (6th Cir.1954)), *enforced in part and remanded,* 552 F.2d 519 (3d Cir.1977). Thus, the acquittal of Teresi would not have prevented the Board from finding that Teresi had in fact made the bomb threat if such a finding were warranted. It is argued that since the NLRB would not ordinarily rely on Teresi's exoneration on the criminal charges as proof of his not having made the bomb threat, testimony by Smith at Teresi's trial would not have related to the interests of employees as employees.

■ This argument fails to recognize that the Board also has indicated that it will consider an acquittal of an employee on criminal charges as evidence of an employer's lack of good faith belief that the employee engaged in misconduct. *See K–D Lamp Division, Concord Control, Inc.,* 228 N.L.R.B. 1484, 1492 (1977). Thus, although an acquittal of Teresi would not have been considered by the Board to be conclusive of whether Teresi made the bomb threat, it could have been considered by the Board in determining whether the Company actually believed that Teresi engaged in strike misconduct. An acquittal would be relevant to a charge that the Company was making an example of a union leader by firing Teresi for participation in the strike, a charge that eventually was made before the ALJ. Thus, we have no doubt under the facts herein that an acquittal of Teresi would have been in the interest of his fellow employees as employees. We therefore conclude, on this

record, that the ALJ and the Board correctly held that Smith's preparation to testify at the scheduled trial of Teresi was concerted protected activity.

### 3. *Prima Facie Case—Evidence of Pretext*

The Company argues that the General Counsel failed to meet his "prima facie" burden of proving that the Company's motivation for firing Smith was his exercise of conduct protected by section 7 of the Act. We disagree. As discussed above, the ALJ recited ample evidence presented by the General Counsel that the Company's proffered reason for discharging Smith was pretextual. See Part 1, *supra*.

■ The Company points to three other employees subpoenaed by Teresi who were not discharged. This presumably negates the inference of an improper motive behind the discharge of Smith. While this reasoning may seem plausible, we must note that the ALJ and the Board both have an expertise in finding and assessing the facts in these kinds of cases to which this court ordinarily will defer. The ALJ found that the firing was aimed at discouraging other employees from offering testimony that would exonerate Teresi. We cannot say that the ALJ abused his discretion by drawing this inference since, as counsel for the Board argues in his brief, one might reasonably infer that the Company fired one activist in order to send a message to others.[4]

We have considered the Company's other arguments, and have found them to lack merit. We therefore grant the Board's application to enforce its order with respect to the Smith discharge.

---

**4.** Whether improper motive is an element of a § 8(a)(1) violation is unclear. *See* 1 The Developing Labor Law 76–78 (C. Morris 2d ed. 1983); Christensen & Svanoe, *Motive and Intent in the Commission of Unfair Labor Practices: The Supreme Court and the Fictive Formality,* 77 Yale L.J. 1269, 1299–1314 (1968); Oberer, *The Scienter Factor in Sections 8(a)(1) and (3) of the Labor Act: Of Balancing, Hostile Motive, Dogs and Tails,* 52 Cornell L.Q. 491, 503–10 (1967). It has been suggested that motive is not a requirement where the employer has engaged in conduct that tends to interfere with employees' rights under the Act. *See* 1 The Developing Labor Law, *supra.* Since the ALJ had sufficient evidence to find an improper motive, we will not attempt to resolve this issue here.