920 F.2d 130
 135 L.R.R.M. (BNA) 3222, 117 Lab.Cas. P 10,438
 PERGAMENT UNITED SALES, INC., Pergament Westbury Corp.,
Pergament Distributors, Inc. and Pergament Home
Centers, Inc., Petitioners, Cross-Respondents,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.
 Nos. 19, 119, Dockets 89-4131, 89-4153.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 30, 1990.
Decided Nov. 27, 1990.
 
 Lea Hixson (Jessel Rothman, P.C., Mineola, N.Y., of counsel), for petitioner-cross-respondent.
 Nancy B. Hunt (Judith A. Dowd, Supervisory Atty., Jerry M. Hunter, General Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, N.L.R.B., Washington, D.C., of counsel), for respondent-cross-petitioner.
 Before FEINBERG and CARDAMONE, Circuit Judges, and RE,* Chief Judge.
 CARDAMONE, Circuit Judge:
 
 
 1
 Petitioners appeal from an August 29, 1989 order of the National Labor Relations Board (Board) finding that they violated Sec. 8(a)(4) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(4) (1988) (Act), and ordering them to cease and desist from certain unfair labor practices and to undertake certain affirmative actions to remedy their violation of the Act. Petitioners on this appeal (respondents in the proceedings below) are a number of corporations formed by the Pergament family, and are hereafter collectively referred to as Pergament. Pergament was charged with a Sec. 158(a)(3) violation, but found by the Board to have committed a Sec. 158(a)(4) violation, for which it had not been charged. It contends its due process rights were thereby violated, and petitions to set aside the Board's order. The Board has cross-moved for its enforcement.
 
 
 2
 Plainly, Pergament was entitled to be advised as to the basis of the complaint against it and afforded an opportunity to explain its conduct. But it knew from the outset that the issue before the hearing officer and the Board was its alleged discrimination in hiring against certain employees by reason of their membership in a local union. The statute makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization," 29 U.S.C. Sec. 158(a)(3), and it also makes it an unfair labor practice for an employer to discharge or discriminate against an employee because he or she has filed an unfair labor practice charge. See 29 U.S.C. Sec. 158(a)(4). The underlying conduct that provided a basis for the Sec. 158(a)(3) charge against Pergament is closely connected to the conduct forming the Sec. 158(a)(4) findings. Because this underlying issue was fully and fairly litigated, the Board's order is enforceable.
 
 BACKGROUND
 
 3
 The Pergament brothers own a two-story retail discount center in Bethpage, New York, most of which had been leased for some years to 22 licensed concessionaires selling men's and ladies' wear, shoes, toys, records, jewelry, liquor, luggage and the like. The concessionaires' employees were represented by Local 1245, United Food & Commercial Workers International Union, AFL-CIO and Pergament retained the right under its leases to enter into collective bargaining agreements with the union on the concessionaires' behalf. Pergament had its own retail operation and its own employees, who were represented by Local 1815, International Brotherhood of Pointers & Allied Trades, AFL-CIO.
 
 
 4
 The instant litigation was precipitated on January 13, 1987 when Pergament sent a letter to Local 1245 advising it that the licensees had been asked to vacate the center by January 31, and that Pergament planned to occupy the entire building itself, using only Local 1815 employees. The letter stated that as of February 1, 1987 no Local 1245 employees would be working at the Bethpage store. A February 25 letter to concessionaire employees stated that former concessionaire employees were welcome to apply for Pergament positions and that Local 1815 would waive an initiation fee.
 
 
 5
 On March 3, 1987 Local 1245 filed charges with the NLRB alleging violations of Secs. 8(a)(1), (2), (3), and (5) of the Act.[1] On June 24, 1987 the NLRB brought a formal complaint against Pergament alleging violations of the same four sections of the Act. It claimed Pergament discriminated against its own employees by encouraging membership in Local 1815 and by discouraging membership in Local 1245. The complaint was later amended to list the names of 13 individuals--former employees of licensees at the center and members of Local 1245--whose Sec. 8(a)(3) rights had allegedly been violated.
 
 A. Hearing
 
 6
 In December, 1987 an Administrative Law Judge (ALJ) conducted a hearing on the charges set forth in the Board's complaint. Two of the 13 individuals did not testify and the ALJ determined there was insufficient proof they had ever filed applications for employment with Pergament. With respect to the other 11 employees, the amended complaint alleged they had completed employment applications to be hired by Pergament, but were refused hire due to their union activities and their support for Local 1245. The General Counsel called eight of them and Local 1245's representative as witnesses. Pergament produced its attorney, Jessel Rothman, and Robert Kramer, its vice president and personnel director, and John Simoncic, a former vice president.
 
 
 7
 Charlotte Zimmerman, one of the eight Local 1245 employees, testified she called Kramer on March 28, 1987 and identified herself and the department she had worked in. She said Kramer told her Pergament had every intention of hiring the concessionaires' terminated employees "but there was a trial coming up and that is the reason why we didn't hear from them." She said Kramer told her he would get in touch with the attorney and see if there was any way to hire her and her colleagues despite the impending trial, but that no one from Pergament ever contacted her.
 
 
 8
 Doris Levine testified she worked in the same department as Zimmerman and had filed an application with Pergament, but had never been contacted about a job. She never complained or called anyone about not getting a job, she said, because Zimmerman had told her about the conversation with Kramer, and as a result Levine believed Kramer would not be able to do anything for her if she called.
 
 
 9
 While the testimony of the other six former employees of the licensees differed in minor detail, all agreed essentially that they had filled out applications for Pergament jobs, they had heard about Kramer's meeting with Local 1245 employees and the statements he made at that time, and had seen Pergament signs or advertisements seeking full and part time employees during the time they were waiting to hear about their own applications. All except one testified that they never received job offers from Pergament. Elly Kircher testified Pergament offered her a job as a full-time cashier, even though she had applied for part-time sales and stock work and even though Pergament was running advertisements at the time seeking part-time help. Kircher also stated that Pergament never contacted her about a job after she refused the full-time job offer. All of these employees save Zimmerman testified that they had done work in all three areas in which Pergament needed help--sales, stock, and cashiering. The union representative testified there were approximately 40 members of Local 1245 employed by Pergament licensees.
 
 
 10
 Kramer stated Pergament had delayed hiring concessionaire employees prior to February in order to maintain friendly relations with the concessionaires, but a rumor started that the employees would be fired. On February 28th, Kramer met with Local 1245 employees and promised no one would be laid off. After the meeting, a union representative called Kramer and told him Local 1245 disagreed with Pergament's statements to the employees.
 
 
 11
 "At that point it stopped. Within that week I got the lawsuit ... at that point there was a lot of confusion because I didn't know how to act. When I get litigation I stop ... the minute I got it ... I put a freeze on everything....
 
 
 12
 I remember that woman calling me ... during that period of time I didn't know what to do. I have never been sued before. I had no idea, should I accept the people, shouldn't I accept the people? At that point there was a certain degree of us holding back."
 
 
 13
 Kramer also said during the spring of 1987 Pergament was desperate to hire people, but that the applications of the 11 employees had somehow been inadvertently mislaid. He denied the applications were processed or seen by anyone involved in hiring. He said further when he received the complaint alleging Pergament's failure to hire, he drove out to the union office to find out the names of the employees Pergament had been accused of not hiring, but the union refused to give the Local 1245 list to him. Kramer averred he never read the amended complaint listing the 13 employees' names, and he also claimed that he did not recognize any of the names, when he read the complaint cover to cover.
 
 
 14
 In the course of the hearing, the ALJ was told by Pergament's counsel its position was that "[w]e did not preclude anyone from employment as we are not precluding anyone today from employment based on any grounds at all other than sheer incompetency."
 
 B. ALJ's Findings
 
 15
 On October 31, 1988 the ALJ ruled Pergament had not violated the sections with which it was charged, but that it had violated Sec. 8(a)(4) of the Act because it had refused to hire the 11 employees as a result of the Local 1245 litigation.
 
 
 16
 The hearing officer found Kramer must at least have seen the amended complaint because he testified he did not recognize the names listed in it, and the amended complaint was the only document that named them. He did not credit Kramer's testimony that he could not offer the women positions because he did not know their names because, "the ALJ found, the names were set forth in the amended complaint issued on July 28, 1987 that Kramer had read." The ALJ also found there was no issue regarding the qualifications of the 11 employees to fill the openings Pergament had in early 1987.
 
 
 17
 The ALJ concluded the real reason these individuals were not hired was because of the pending litigation. He also held Pergament was not prejudiced by the General Counsel's failure to amend the complaint to include a charge under Sec. 8(a)(4) because the charge of failure to hire was included in the original complaint, the issue had been fully litigated, and the General Counsel's evidence on the issue came substantially from Kramer.
 
 
 18
 He recommended the Board order petitioners to offer the 11 employees positions "substantially similar to the work they previously were performing while employed in the Bethpage store, and to make them whole for any loss of earnings they may have suffered as a result of the discrimination against them," to remove from their files any reference to the unlawful refusal to hire them, and to notify the employees that this step had been taken and that they would not be further discriminated against. The petitioners were further required to preserve and make available to the Board all records needed to calculate the amount of back pay due the 11 individuals and to post signed copies of an appropriate notice at the Bethpage facility. The hearing officer also recommended that the Board order petitioners to cease and desist from further discrimination against any applicant because of any ongoing union litigation, as well as from interfering or coercing employees in the exercise of the rights guaranteed by the Act.
 
 C. The Board's Order
 
 19
 The NLRB affirmed the ALJ's findings and adopted the recited recommended ordering provisions. See Pergament United Sales, Inc., 296 N.L.R.B. 44 (1989). The Board also concluded that Pergament was not prejudiced by the General Counsel's failure to amend the complaint to include a charge under Sec. 8(a)(4), because Pergament's proffer of the evidence it would have presented, had the complaint included the Sec. 8(a)(4) violation, would not have strengthened its defense.
 
 
 20
 The Board also asserted it had authority to find and remedy a violation in the absence of a specific charge because the issue was closely connected to the subject matter of the original complaint and was fully litigated. The Board stated "the ultimate issue in both allegations is the same: whether the Respondent failed to hire the employees for reasons that are unlawful under the Act." It further asserted its conclusion was proper under these circumstances because it furthered the significant policies of the Act by allowing the Board to redress a violation openly admitted by an employer.
 
 DISCUSSION
 I Due Process
 
 21
 The principal issue raised is whether a violation of Sec. 8(a)(4) of the Act may be found when that unfair labor practice charge was not included in the Board's original complaint. Pergament contends the Board's finding under Sec. 8(a)(4), in the absence of any statement in either the charges or the complaints that the General Counsel intended to proceed under that section, denied petitioner its right to due process because it had neither notice nor a meaningful opportunity to defend itself.
 
 
 22
 The resolution of this issue requires an analysis of the obvious. It is a basic tenet of Anglo-American law that one accused of a wrong has the right to be notified of the specific charges raised against him and an opportunity to defend himself against them; the tenet is capsulized in the Fifth Amendment: "No person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Due process requires the Board to afford an alleged violator notice and an opportunity for a hearing on a charge under the Act, see N.L.R.B. v. Coca Cola Bottling Co., 811 F.2d 82, 87 (2d Cir.1987); N.L.R.B. v. Chelsea Laboratories, Inc., 825 F.2d 680, 682 (2d Cir.1987), cert. denied, 484 U.S. 1026, 108 S.Ct. 750, 98 L.Ed.2d 763 (1988), but the Fifth Amendment protects substantial rights, it does not guarantee any particular form of procedure. See N.L.R.B. v. Mackay Radio & Tel. Co., 304 U.S. 333, 351, 58 S.Ct. 904, 913, 82 L.Ed. 1381 (1938).
 
 
 23
 In the context of the Act, due process is satisfied when a complaint gives a respondent fair notice of the acts alleged to constitute the unfair labor practice and when the conduct implicated in the alleged violation has been fully and fairly litigated. See Coca Cola Bottling Co., 811 F.2d at 87; Chelsea Laboratories, 825 F.2d at 682. Pergament also relies on the Administrative Procedure Act, 5 U.S.C. Sec. 554(b) (1988) (APA), which requires respondents in an agency hearing of this sort to be informed of the matters of fact and law asserted. Even assuming the APA may be raised for the first time on appeal, it is of no assistance to petitioners here because it requires the same analysis regarding full and fair litigation that the Board's rules require. See N.L.R.B. v. Majestic Weaving Co., 355 F.2d 854, 861-62 (2d Cir.1966).
 
 A. Notice
 
 24
 Thus, we must decide whether Pergament had sufficient notice of the allegedly violative acts, and whether the Sec. 8(a)(4) charge was fully and fairly litigated. Notice does not mean a complaint necessarily must state the legal theory upon which the General Counsel intends to proceed. Instead notice must inform the respondent of the acts forming the basis of the complaint. For example, the Board's rules require the complaint to contain "[a] clear and concise description of the acts which are claimed to constitute unfair labor practices, where known, the approximate dates and places of such acts and the names of respondent's agents or other representatives by whom committed." 29 C.F.R. Sec. 102.15(b) (1990) (emphasis added).
 
 
 25
 In Mackay, the complaint charged that a company discriminated by discharging five men, then was amended to charge the discrimination occurred through the failure to re-employ the men. The Board in fact found the discrimination occurred through a wrongful discharge. The Supreme Court held this discrepancy between charge and ultimate finding did not work a violation of the company's due process rights. "[A]t no time during the hearings was there any misunderstanding as to what was the basis of the Board's complaint." 304 U.S. at 349-50, 58 S.Ct. at 912-13; see also N.L.R.B. v. Scenic Sportswear, 475 F.2d 1226, 1227 (6th Cir.1973) (complaint alleging company violated Sec. 8(a)(1) by surveilling union activities apprised company of allegedly unlawful conduct and did not violate due process even though trial examiner found the behavior might not be accurately characterized as "surveillance"); Tex Tan Welhausen Co. v. N.L.R.B., 419 F.2d 1265, 1269-70 (5th Cir.1969) (company charged under the Act has sufficient notice whenever the acts found to violate the NLRA may be fairly understood from the complaint), vacated and remanded on other grounds, 397 U.S. 819, 90 S.Ct. 1516, 25 L.Ed.2d 805 (1970).
 
 
 26
 Pergament had sufficient notice of the acts upon which the General Counsel based its charge. The May 5, 1987 complaint alleged Pergament did not hire the employees because of their union activity. The amended complaint listed 13 individuals Pergament allegedly refused to employ "because the employees named therein joined, supported and assisted Local 1245, and in order to discourage employees from engaging in such activities." Pergament was therefore aware from the beginning of the proceeding that a critical issue would be its motivation in not offering jobs to the 13 employees listed in the amended complaint.
 
 
 27
 It clearly would have been preferable for the Board to have charged Pergament with a violation of Sec. 8(a)(4) as well as Sec. 8(a)(3) from the outset, and it would have been better had Pergament been notified of the change in the improper motive alleged prior to the issuance of the ALJ's decision. However, whether the alleged improper motive in refusing to hire was because these employees were involved in union activities or because they were involved in the union's litigation is a minor distinction without significant legal consequences on the facts of this case. The significant point is Pergament had notice that its motive in not hiring the 11 employees was to be the issue at the hearing. See Mackay, 304 U.S. at 349-50, 58 S.Ct. at 912-13; Coca Cola Bottling, 811 F.2d at 88 (when charge directed defense's attention at Sec. 8(a)(1) type activities, company had fully and fairly litigated issue even though Board did not charge a violation of Sec. 8(a)(1), but only of Sec. 8(a)(3)).
 
 
 28
 The primary function of notice is to afford respondent an opportunity to prepare a defense by investigating the basis of the complaint and fashioning an explanation of events that refutes the charge of unlawful behavior. See Soule Glass and Glazing Co. v. N.L.R.B., 652 F.2d 1055, 1074 (1st Cir.1981), rev'd on other grounds, N.L.R.B. v. Curtin Matheson Scientific, Inc., --- U.S. ----, 110 S.Ct. 1542, 108 L.Ed.2d 801 (1990). Pergament knew the identity of at least 13 members of Local 1245, and that it was charged with failing to hire them in the spring of 1987 because of their membership in Local 1245. It therefore had an adequate opportunity to investigate both the circumstances of its failure to hire them and to offer an innocent explanation for its conduct. The record of the hearing demonstrates Pergament attempted to do precisely that. In light of the clear identification of the issue and the strategy Pergament employed during the hearing, we conclude the amended complaint afforded petitioners sufficient notice regarding the charges they were held to have violated.
 
 B. Full and Fair Litigation of the Charge
 
 29
 We further hold that Pergament fully and fairly litigated the issue of its motive with regard to the hiring of the employees. Pergament relies on a number of cases where due process was found lacking from findings based on uncharged violations. But, in those cases the uncharged violations were held not to have been fully and fairly litigated. See N.L.R.B. v. Tamper, Inc., 522 F.2d 781, 788-89 (4th Cir.1975) (uncharged violation offered only as background and company made no attempt to justify actions); Engineers & Fabricators, Inc. v. N.L.R.B., 376 F.2d 482, 485-86 (5th Cir.1967) (counsel said he did not understand relevance of evidence later used to support uncharged violation, charge not fully litigated); Montgomery Ward & Co. v. N.L.R.B., 385 F.2d 760, 763-64 (8th Cir.1967) (additional violations not referred to in opening statement, respondent objected to evidence as outside pleadings and no amendment made to complaint, issues not fairly tried); Majestic Weaving, 355 F.2d at 861-62 (hearing focus on another issue and evidence of uncharged violation "at most incidental"). The point these cases make most clearly is that whether a charge has been fully and fairly litigated is so peculiarly fact-bound as to make every case unique; a determination of whether there has been full and fair litigation must therefore be made on the record in each case.
 
 
 30
 We believe the difference between the charge made and the violation found in the instant case is small, if not minuscule. Section 8(a)(4) makes it an unfair labor practice for an employer to discriminate against an employee because she has filed charges, and Sec. 8(a)(3) provides it is an unfair labor practice to use hiring or tenure in employment as a method of discouraging membership in a union. Both sections go to motive. Whether the motive here was discouraging the 11 employees from being members of Local 1245, as prohibited by Sec. 8(a)(3), or the refusal to hire these women because they had filed charges, as barred by Sec. 8(a)(4), had no impact on the ultimate underlying issue before the Board: whether employees were not hired because they were in some way associated with Local 1245.
 
 
 31
 The due process clause does not require a precise statement of the theory upon which the General Counsel intends to proceed under the Act, with the threat that failure of precision in pleading will require the General Counsel to re-try the case. This is particularly true here where the strongest evidence of the Sec. 8(a)(4) violation originated from the petitioners' own personnel director, whose testimony merely substituted one illegal motive for another.
 
 
 32
 The hearing record further reveals that petitioners had a full and fair opportunity to litigate the issue of the motivation on which this charge was premised. This conclusion is borne out by the fact that Pergament never objected to the introduction of the evidence upon which the ALJ based his Sec. 8(a)(4) finding, and that during the hearing Pergament proceeded in exactly the same way it would have been expected to proceed had the General Counsel stated the Sec. 8(a)(4) illegal motive was behind the failure to hire. For example, Pergament's cross-examination concentrated on trying to establish that the testifying employees never complained to the union that Pergament had not fulfilled its promise of a job. In addition, its cross-examination of Charlotte Zimmerman--the only witness who testified she had talked with Kramer--focused on eliciting statements that Kramer had not explicitly told her he would not hire her. Pergament also attempted to extract statements either that the employees would not have accepted jobs had they been offered or that they were not qualified to do the jobs available.
 
 
 33
 Again, Pergament attempted to present evidence of a proper motive, that is, it had no motive for not hiring, it simply lost the applications. It tried to demonstrate that its actions were innocent because Kramer did not know who these employees were, and addressed the question of motive in its closing arguments. Thus, the defense presented was not dependent on whether Pergament's motive was to discourage all Local 1245 activity or just this litigation.
 
 
 34
 Pergament asserts it would have presented a different case had it known the NLRB was alleging its motive was that it discriminated on the basis of the Local 1245 litigation. It says it would have called the labor representatives from the Local to testify they told Kramer they would not release the names of the union members who might be seeking employment with Pergament. Yet, as the General Counsel points out, this was already on the record through Kramer's own testimony, which the ALJ credited. Pergament also states vaguely that it would have introduced "important third party testimony" to show Kramer affirmatively attempted to hire all of the Local 1245 employees. But if Pergament had such testimony available as to the 11 employees involved it surely would have presented that evidence to refute the Sec. 8(a)(3) charge, which relates to "hire or tenure of employment." Pergament was not kept in the dark, it was aware of and actively litigated the motivation issue. Consequently, the hearing record itself refutes the petitioners' claim of a denial of due process. See Coca Cola Bottling, 811 F.2d at 87-88; Tex Tan Welhausen Co., 419 F.2d at 1269-70.
 
 
 35
 Moreover, Sec. 160(b) empowers the Board or the ALJ "in its discretion" to amend the complaint "at any time prior to the issuance of an order based thereon." 29 U.S.C. Sec. 160(b). Thus, the statute itself permits these administrative officers to add to the charges of the complaint, see American Newspaper Publishers Ass'n v. N.L.R.B., 193 F.2d 782, 798 (7th Cir.1951), so long as due process is not denied in what is a civil proceeding. See Sec. 160(b). Consequently, due process is not eroded by our refusal to remand this matter to the Board for it to entertain a new complaint containing the Sec. 8(a)(4) charge.
 
 II Prima Facie Case of Illegal Motive
 
 36
 Pergament contends, citing N.L.R.B. v. Wright Line, A Division of Wright Line, Inc., 251 N.L.R.B. 1083 (1980), enf'd, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), that the General Counsel failed to make out a prima facie case of improper motive. This assertion evidences a misunderstanding of the rules of law here applicable. This is not a dual motive case, but rather a straightforward determination involving a single motive on the credited evidence.
 
 
 37
 In all cases alleging unfair labor practices, the General Counsel has the burden of showing, by a preponderance of the evidence, that an improper motive contributed to the employer's action. N.L.R.B. v. Transportation Management, 462 U.S. 393, 398-99, 103 S.Ct. 2469, 2472-73, 76 L.Ed.2d 667 (1983). The General Counsel is not required to prove the improper motive was the sole cause of the action, but only that improper motivation contributed to the action taken. Id. In a line of cases beginning with Wright Line, it has become clear that, where the credited evidence supports the existence of both a proper and an improper motive, the employer has the affirmative defense of showing by a preponderance of the evidence that it had another, valid reason for firing an employee and that such reason would have caused it to take the action even absent the anti-union motive. See id. at 402, 103 S.Ct. at 2474; Abbey's Transp. Services, Inc. v. N.L.R.B., 837 F.2d 575, 579 (2d Cir.1988). Hence, in a mixed or dual motive case, the General Counsel must establish a prima facie case that the employer's action in discharging or refusing to employ an employee was the result of an improper motive. The burden then shifts to the employer, which must show by a preponderance of the evidence as an affirmative defense, that it would have taken the same action in any event for valid reasons.
 
 
 38
 This case does not fall under the dual motive analysis. Here, the credited evidence did not support the existence of both a proper and an improper motive. See, e.g., Brock v. Casey Truck Sales, Inc., 839 F.2d 872, 878 (2d Cir.1988). Rather, the ALJ did not credit Kramer's explanation that the company had lost the applications and that he had no way of discovering the identities of the members of Local 1245 who were unhired concessionaire employees. It was appropriate for the ALJ and the Board to make a credibility determination. N.L.R.B. v. Independent Ass'n of Steel Fabricators, Inc., 582 F.2d 135, 151 (2d Cir.1978), cert. denied, 439 U.S. 1130, 99 S.Ct. 1049, 59 L.Ed.2d 91 (1979), and once the discredited evidence has been eliminated, the credited evidence in this case supports by a preponderance of the evidence not two motives, but only the improper motive given by Kramer.
 
 III Substantial Evidence
 
 39
 Having determined this is a single motive matter, the issue therefore resolves itself into whether the General Counsel met the overall burden of demonstrating by substantial evidence that the single motive improperly contributed to petitioners' failure to hire the 11 discriminatees.
 
 
 40
 We do not review the Board's determination regarding improper motive de novo. The standard of review is whether there is substantial evidence, when the record is viewed as a whole, including the body of evidence opposed to the Board's view, to support the Board's finding that Pergament violated Sec. 8(a)(4). Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); NLRB v. J. Coty Messenger Service, Inc., 763 F.2d 92, 96 (2d Cir.1985). The Board's findings are not lightly overturned. Its acceptance of an ALJ's findings regarding witness credibility will not be reversed unless those findings are "hopelessly incredible." NLRB v. American Geri-Care, Inc., 697 F.2d 56, 60 (2d Cir.1982), cert. denied, 461 U.S. 906, 103 S.Ct. 1876, 76 L.Ed.2d 807 (1983).
 
 
 41
 Here, the ALJ discredited Kramer's testimony that he never knew or saw the names of the employees and his explanation that the employees were not hired because the applications were temporarily lost. He did credit Kramer's statement that he refused to hire employees once the litigation had begun. The ALJ also believed Charlotte Zimmerman's testimony that Kramer told her he could not hire her because of the litigation. None of these findings is hopelessly incredible. The ALJ's findings--accepted by the Board--must be regarded as conclusive.
 
 
 42
 The Board's finding of improper motive is supported by Kramer's statement regarding his motive. Kramer, one of the top three officers at Pergament, bore the primary responsibility for hiring. His statement of motive can therefore be fairly attributed to Pergament, and as such provides substantial evidence of improper motive. Cf. N.L.R.B. v. John Langenbacher Co., 398 F.2d 459, 463 (2d Cir.1968), cert. denied, 393 U.S. 1049, 89 S.Ct. 685, 21 L.Ed.2d 691 (1969). Zimmerman's testimony confirming Kramer's motive serves to bolster the Board's conclusions.
 
 
 43
 In addition, the Board and the ALJ concluded that Pergament had a list of Local 1245 union members available to it. Pergament stipulated that the advertisements the General Counsel submitted accurately demonstrated Pergament needed employees, especially cashiers, at the time of the litigation. Pergament did not contest the evidence that at least ten of the witnesses filled out applications for jobs, and many of them had commendable work records of long term employment with the concessionaires and possessed skills Pergament needed during the spring of 1987.
 
 
 44
 Against this evidence is the evidence that Pergament offered one employee a full-time position, which she turned down because she wanted part-time work, as well as Kramer's testimony that the applications were lost. Pergament's contention that none of the employees would have accepted jobs if they had been offered is speculative because in fact only one of the employees received offers.
 
 
 45
 Pergament argues vigorously that it cannot be found in violation of Sec. 8(a)(4) when none of the employees complained to the union, citing Gibbs Shipyards, Inc. v. N.L. R.B., 333 F.2d 459 (5th Cir.1964), in support of its argument that the Board cannot find a Sec. 8(a)(4) violation where there is no evidence that the company knew the employee had testified against it. In Gibbs, there was no evidence that the company knew of the testimony or had any intent to discriminate. Id. at 462. In contrast, here there was evidence from Pergament's own personnel director not only that the company knew of the ongoing proceedings, but that it had decided not to hire Local 1245 members because of those proceedings. It is true that there is no direct evidence that the company took steps to discover the names of the members of Local 1245. Yet there is evidence that the names were available to the petitioners and the employees were not hired because of the ongoing litigation.
 
 
 46
 As the Board points out, "[i]ntent is subjective and in many cases can be proved only by the use of circumstantial evidence. In analyzing the evidence, circumstantial or direct, the Board is free to draw any reasonable inference." NLRB v. Senftner Volkswagen Corp., 681 F.2d 557, 559 (8th Cir.1982). It was not unreasonable for the Board to conclude that Pergament, knowing that the litigation was brought by the union, and having possession of a 1982 list of Local 1245 employees, had the means to identify the employees, even if the employees themselves were not directly involved in bringing the charges. Thus, on this record, the Board's findings were supported by substantial evidence.
 
 CONCLUSION
 
 47
 In sum, while we do not condone the Board's failure to charge Pergament with a violation of Sec. 8(a)(4) prior to the hearing, we hold that in the circumstances of this case, Pergament had notice of the Sec. 8(a)(4) violation and an opportunity to fully and fairly litigate it sufficient to meet due process standards. The Board made out a prima facie case of a Sec. 8(a)(4) violation and its findings were supported by substantial evidence.
 
 
 48
 Accordingly, the petition to set aside the Board's order is denied and enforcement of that order is granted.
 
 
 
 *
 Honorable Edward Re, Chief Judge, United States Court of International Trade, sitting by designation
 
 
 [1]
 29 U.S.C. Sec. 158(a)(1), (2), (3), (5) (1988) provides:
 It shall be an unfair labor practice for an employer--
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it ...
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ...
 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.